**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6499
E-mail:  jpafiti@pomlaw.com

**Attorneys for Plaintiff**
*- additional counsel on signature page -*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANANDA PATTI, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FITBIT, INC., JAMES PARK, and WILLIAM ZERELLA, <br><br> Defendants. | **Case No.:** <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Ananda Patti ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fitbit, Inc. ("Fitbit" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Fitbit securities between August 2, 2016 through January 30, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.       Fitbit is a technology company focused on delivering health solutions that impact health outcomes. The Fitbit platform combines wearable devices with software and services to give our users tools to help them reach their health and fitness goals, augmented by general purpose features that add further utility and drive user engagement.   Its wearable devices, which include health and fitness trackers and smartwatches, enable our users to view data about their daily activity, exercise and sleep in real-time.

3.       The core of the Company's platform is its family of wearable devices. These devices automatically track users' daily steps, calories burned, distance traveled, and active minutes, and display real-time feedback to encourage users to become more active in their daily lives. Most of its wearable devices also measure floors climbed, and sleep duration and quality, and its more advanced products track heart rate, and GPS-based information such as speed, distance, and exercise routes. Several of its devices also have more advanced features such as the ability to receive call and text notifications, and our first smartwatch, Fitbit Ionic, offers contactless payments, on-board music, notifications, and several apps.

4.       Throughout the Class Period, Defendants made materially false and/or misleading statements regarding the Company's business, operational and compliance policies.   Specifically,

Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company was facing headwinds, caused by greater competition in the marketplace; (ii) the Company was failing to differentiate its products from its competitors, including Apple Inc.'s ("Apple") Watch; (iii) consequently, demand for Fitbit's products was faltering; (iv) the Company overstated its financial guidance; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.      On November 2, 2016, Fitbit issued a press release announcing its financial results for the third fiscal quarter of 2016, which disclosed that it was lowering its full year 2016 revenue guidance to "between $2.320 billion and $2.345 billion," down from the previously-announced "$2.5 to $2.6 billion."

6.      On this news, Fitbit's share price fell $4.30 per share, or 33.6%, to close at $8.51 per share on November 3, 2016.

7.      On January 30, 2017, Fitbit issued a press release announcing its preliminary fourth fiscal quarter 2016 financial results, which disclosed that the Company expected fourth quarter of 2016 revenue to be in the range of $572 million to $580 million, rather than its previously announced guidance range of $725 million to $750 million. Fitbit further announced that it forecasted its annual revenue growth to be approximately 17%, rather than the previously-announced forecast of 25% to 26%.

8.      On this news, Fitbit's share price fell $1.15 per share, or 16%, to close at $6.06 per share on January 30, 2017.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

10.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

12.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the Company's principal executive offices are located within this Judicial District.

13.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications and the facilities of a national securities exchange.

**PARTIES**

14.    Plaintiff, as set forth in the attached Certification, acquired the Company's securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

15.    Defendant Fitbit, Inc. is incorporated in Delaware and its principal executive offices are in San Francisco, California.  Fitbit's Class A common stock trades on the New York Stock Exchange ("NYSE") under the symbol "FIT."

16.    Defendant James Park was the President, Chief Executive Officer ("CEO"), and Chairman of Fitbit at all relevant times.

17. Defendant William Zarella ("Zerella") was the Chief Financial Officer ("CFO") of Fitbit at all relevant times.

18. The Defendants referenced above in ¶¶ 16-17 are sometimes referred to herein collectively as the "Individual Defendants."

19. The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## **SUBSTANTIVE ALLEGATIONS**

### **Background**

20. Fitbit is a technology company focused on delivering health solutions that impact health outcomes. The Fitbit platform combines wearable devices with software and services to give our users tools to help them reach their health and fitness goals, augmented by general purpose features that add further utility and drive user engagement. Its wearable devices, which include health and fitness trackers and smartwatches, enable our users to view data about their daily activity, exercise and sleep in real-time.

21. The core of the Company's platform is its family of wearable devices. These devices automatically track users' daily steps, calories burned, distance traveled, and active minutes, and display

real-time feedback to encourage users to become more active in their daily lives. Most of its wearable devices also measure floors climbed, and sleep duration and quality, and its more advanced products track heart rate, and GPS-based information such as speed, distance, and exercise routes. Several of its devices also have more advanced features such as the ability to receive call and text notifications, and our first smartwatch, Fitbit Ionic, offers contactless payments, on-board music, notifications, and several apps.

### Materially False and Misleading Statements Issued During the Class Period

22.     The Class Period begins on August 2, 2016, when the Company issued a press release entitled "*Fitbit Reports $587M Q216 Revenue, $0.03 GAAP EPS/$0.12 Non-GAAP EPS, and Confirms Revenue and Profit Guidance for FY16*." The press release stated, in relevant part:[1]

> Fitbit, Inc. (NYSE:FIT), the leader in the connected health and fitness market, today reported revenue of $586.5 million, GAAP diluted net income per share of $0.03, non-GAAP diluted net income per share of $0.12, GAAP net income of $6.3 million, and adjusted EBITDA of $48.3 million, for its second quarter of 2016.

> "***Second quarter results reflect accelerated unit and revenue growth in the U.S. and EMEA, our two largest markets, despite an unusually strong Q215 with the full availability of Fitbit Charge HR fulfilling built-up demand in that quarter,***" *said James Park, Fitbit co-founder and CEO. "**Our strong profitability reflects careful management of operating expenses, while we continue to invest in future growth. Based on the progress of our business, against a backdrop of a growing worldwide opportunity for our products, we remain confident in our guidance for the year**."

> *        *        *

> **Second Quarter 2016 Financial Highlights**

> - Sold 5.7 million devices

> - Q216 revenue increased 46% year-over-year

---

[1] Emphasis added unless otherwise noted.

- U.S. comprised 76% of Q216 revenue; EMEA 17%, APAC 2%, and Other Americas 5%

- U.S. revenue grew 42% year-over-year; EMEA 150%, APAC (54)%, and Other Americas 63%

- APAC was impacted by factors including the progressive shut down of retailer Dick Smith in Australia and a reduction of channel inventory. Excluding the Australia impact, APAC revenue increased 98% year-over-year.

- New products, Fitbit BlazeTM and AltaTM, including related accessories, comprised 54% of Q216 revenue, compared to 50% in Q116

- Gross margin was affected by an increase in warranty reserves for legacy products, with an expectation the additional reserves taken will adequately cover future warranty liability, allowing a return to more normalized gross margins beginning in Q316

- The 120% GAAP and 90% non-GAAP year-over-year increase in operating expense reflects increased investments in R&D and marketing to drive innovation and growth

\*      \*      \*

**Outlook and Guidance**

Fitbit's outlook for the third quarter of 2016 is as follows:

- Revenue in the range of $490 to $510 million

- Non-GAAP gross margin of approximately 48% to 49%

- Adjusted EBITDA in the range of $70 to $80 million

- Non-GAAP diluted net income per share in the range of $0.17 to $0.19

- Non-GAAP diluted share count between 244 and 247 million

- Stock-based compensation expense in the range of $26 to $28 million

- Non-GAAP tax rate of approximately 30%

Fitbit's outlook for the full year of 2016 is as follows:

- Revenue in the range of $2.5 to $2.6 billion

- Non-GAAP gross margin of approximately 47%

- Adjusted EBITDA in the range of $430 to $490 million

- Non-GAAP diluted net income per share in the range of $1.12 to $1.24

- Non-GAAP diluted share count between 244 and 250 million

- Stock-based compensation expense in the range of $92 to $97 million

- Non-GAAP tax rate of approximately 30%

23.     Also on August 2, 2016, Fitbit held a conference call to discuss its financial results for the second fiscal quarter of 2016. On that call, Defendant Park touted the Company's growth, stating in relevant part:

> ***I'm excited to report another quarter that demonstrated Fitbit's continued growth and positive impact on health and fitness for consumers around the world***. The latest industry reports by IDC show that Fitbit continues to be the leader in the worldwide wearable market by units as of the end of Q1. U.S. unit and dollar growth accelerated over Q1 despite an unusually strong Q2 of last year that benefited from the full availability of Charge HR, and we demonstrated continued growth into an expanding long-term international market opportunity.
>
> In addition, given consumer response to Fitbit Blaze and Alta so far this year, the early positive response from retailers seeing the new products we have for the fall are increasing brand strength and distribution footprints, and network effects from our large active user community and a continuing R&D investments we are making to integrate more deeply into the healthcare ecosystem, which will make our devices essential part of people's lives. I'm confident in the company's future for the rest of this year and beyond. In fact, I'm so confident that I will not sell any stock till the end of the year. Joining me in that commitment are co-founder and CTO, Eric Friedman; and CFO, Bill Zerella. We continue to lead the wearables category we helped to create and see substantial runway

ahead. We continue to have the leading unit market share in the U.S. for connected activity trackers. In fact Charge HR and Alta, our two most popular activity trackers sold in Q2.

*        *        *

Our advantage in broad global distribution and consumer awareness has required significant and consistent investment over a long period of time. To gain retail presence requires giving retailers good margins and compelling merchandising support, including displays in which we are investing substantially. In the same vein, the strength of the Fitbit brand driven by our significant investments in marketing activities and advertising has driven our success with products such as Blaze and Alta and the overall growth of our business in key countries across the world.

*        *        *

I want to wrap up this part of my discussion with a couple of thoughts about demand and our growth opportunity. We believe that smartphone penetration provides a reasonable point of comparison for addressable opportunities in different markets as we believe a significant portion of smartphone users can become Fitbit users over time. I think it's worth highlighting some of the numbers that quantify both the size and expected duration of our market opportunity. This year there are expected to be more than 2 billion smartphones in use around the world. As of the end of the second quarter 2016, Fitbit has shipped a lifetime total of 35.6 million Fitbits in the U.S. which represent only 15% of the approximately 230 million smartphones here.

24.    Similarly, Defendant Park touted on the call the marketplace demand for the Company's new products, stating in relevant part:

Fitbit Blaze and Alta have achieved strong rankings on Amazon in the U.S. and together have earned nearly 7,000 reviews, which is significant given the short time in market with both products rated four stars or better. Of all the activations of Alta and Blaze in the second quarter, approximately two-thirds were by new customers and the other one-third were by people who own or previously owned another Fitbit device. Similar to last quarter, approximately one-fifth of those repeat purchasers were reactivations having been inactive for 90 days or more. This demonstrates that our business is both sustainable and growing, attracting new customers while successfully trading existing users up to new devices.

We have additional new products to come this year. The positive response we have received from retailers, who have had the chance to preview these new products under NDA in recent weeks, strengthens our confidence in our guidance for the year. Fitbit will have more new products for consumers to choose from for this year's holiday season than we've ever had before.

25.     Moreover, Defendant Park also downplayed the threat of increased competition for its products, stating in relevant part:

Earlier this year, we expanded our addressable market opportunity with the Fitbit Blaze, which has done incredibly well. The number of Fitbit Blaze devices sold alone was a close second to IDC's estimate for the Apple Watch in the second quarter. ***It's exciting to be leading in such a large and expanding category with IDC predicting at 20% compounded annual growth rate expecting more than 200 million wearable devices shipping in 2020.***

An opportunity of this size will naturally attract a great deal of competition. ***There is a misconception that an increasing number of competitors in the crowded marketplace have created a significant headwind for us, with new market entrants large and small being called out with some concern. However, it's not the number of competitors that is important, but their impact on the market. And the reality is that most of these entrants have not altered the competitive dynamics of our industry. That may come as a surprise to casual observers, but the simple answer is, this is not a simple market to succeed in for a number of reasons.***

*        *        *

Consumers love our devices, as reflected by ratings on places such as Amazon, but the device is only one part of the consumers' experience. Significant effort is required to continually improve the interactive experience for Fitbit users in our apps, which is reflected in the fact that our apps are currently top ranked in their categories in the top app stores.

The robust social experience in the Fitbit app is another key part of our success and it's created a competitive moat supported by the network effect of our large active user community. We believe people are more likely to buy a Fitbit over a competitor, because their friends and family are more likely to be already participating in the Fitbit social experience and we believe people are less likely to leave to a competitor, due to similar dynamics.

26.     As for the Company's financial guidance, Defendant Zerella stated on the call:

Our revenue guidance reflects the impact of seasonality combined with clearing the channel of several legacy products. While we expect to start refilling the channel in the latter part of Q3 2016 in connection with new products for the holidays, revenue will be dependent on the production ramp coming out of the factory. This guidance also reflects further reductions in channel inventory in Asia Pac during the quarter before an expected resumption of growth in that region in Q4 2016. I want to emphasize that even with this channel clearing, the midpoint of our guidance reflects a 22% year-over-year increase in revenue and a 58% sequential increase in adjusted EBITDA, reflecting the expected improvement in operating leverage beginning in the second half.

27.     On August 4, 2016, Fitbit filed its quarterly report with the SEC on Form 10-Q for the quarterly period ended July 2, 2016. The Company's 10-Q was signed by Defendant Zerella and reaffirmed the financial results announced in the press release issued on August 2, 2016.

28.     On October 6, 2016, Defendant Park appeared on CNBC for an interview with stock analyst and TV persona, Jim Cramer. During that interview, Defendant Park touted the Company's business prospects and disregarded the threat that the Apple Watch posed to the Company, and stated that the "Fitbit Charge 2 is the No. 1 best-selling fitness tracker on Amazon." Defendant Park further added that Fitbit is "a fitness social network that is coupled to hardware, and we are on the cusp of transitioning the mission and purpose of our company from a consumer electronics company to a digital healthcare company."

29.     The above statements identified in ¶¶ 22-28 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (i) the Company was facing headwinds, caused by greater competition in the marketplace; (ii) the Company was failing to differentiate its products from its competitors, including Apple's Watch; (iii) consequently, demand for Fitbit's products was faltering; (iv) the Company overstated its financial guidance; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

30.     The truth concerning the Company's operations first began to emerge on November 2, 2016, when Fitbit issued a press release announcing its Q3 2016 financial results. In the press release, Fitbit disclosed that it was lowering its full year 2016 revenue guidance, stating in relevant part:

**Business Outlook**

- Full year 2016:

The company expects revenue between $2.320 billion and $2.345 billion, representing growth of 25%-26%, with non-GAAP earnings per diluted share in the range of $0.55 to $0.59, and a non-GAAP tax rate of approximately 34%.

- Fourth quarter 2016:
  The company expects revenue between $725 million and $750 million, representing growth of 2%-5%, with non-GAAP earnings per diluted share in the range of $0.14 to $0.18, and a non-GAAP tax rate of approximately 33%.

31.    On this news, Fitbit's share price fell $4.30 per share, or 33.6%, to close at $8.51 per share on November 3, 2016, on unusually heavy trading volume.

32.    On November 4, 2016, Fitbit filed its quarterly report for the period ended October 1, 2016 with the SEC. The 10-Q was signed by defendant Zerella and reaffirmed the financial results announced in the Company's November 2, 2016 press release.

33.    Then, on January 30, 2017, the Company issued a press release entitled "*Fitbit Announces Preliminary Fourth Quarter 2016 Results*."  In the press release, Fitbit announced that it expected fourth quarter of 2016 revenue to be in the range of $572 million to $580 million, substantially lower than its previously announced guidance range of $725 million to $750 million. Additionally, Fitbit announced expected annual revenue growth of approximately 17%, rather than the previously-announced forecast of 25% to 26%.  Last, Fitbit stated that it expected its non-GAAP fourth quarter gross margin to be "materially below its previously issued 46% guidance . . . ."

34.    On this news, Fitbit's share price fell $1.15 per share, or 16%, to close at $6.06 per share on January 30, 2017, on unusually heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

35.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the Company's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and

directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

36.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

39.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

•      whether the federal securities laws were violated by Defendants' acts as alleged herein;

•      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of the Company;

• whether the Individual Defendants caused the Company to issue false and misleading financial statements during the Class Period;

• whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

• whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

• whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

41.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

• Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

• the omissions and misrepresentations were material;

• the Company's securities are traded in an efficient market;

• the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

• the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

42.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

43.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in Affiliated Ute Citizens of the State of Utah v. United States, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

44.    Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

45.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

46.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and

sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the Company's securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire the Company's securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

47.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for the Company's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's finances and business prospects.

48.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

49.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors

of the Company, the Individual Defendants had knowledge of the details of the Company's internal affairs.

50.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of the Company's securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning the Company's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired the Company's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

51.    During the Class Period, the Company's securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of the Company's securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of the Company's securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market

price of the Company's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

52.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

53.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

54.    Plaintiff repeats and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

55.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of income and expenses and false financial statements.

56.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

57.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the

Company's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

58.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company.  By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

59.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  November 15, 2018

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6499
E-mail:  jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com

*Attorneys for Plaintiff*

**Submission Date**

2018-11-05 11:59:06

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.    I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Fitbit, Inc. ("Fitbit" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire Fitbit securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Fitbit securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in Fitbit securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.

## Name

**Print Name**

Ananda Patti

## Acquisitions

**Configurable list (if none enter none)**

| Date Acquired | Number of Shares Acquired | Price per Share Acquired |
|---|---|---|
| 8/2/16 | 500 | 13.44 |
| 8/2/16 | 500 | 13.19 |
| 10/7/16 | 1000 | 14.02 |
| 10/14/16 | 1000 | 13.1499 |
| 10/27/16 | 1000 | 13.74 |
| 10/28/16 | 500 | 13.51 |

| 10/31/16 | 500 | 13.21 |
| 10/31/16 | 500 | 13.1 |
| 11/02/16 | 500 | 12.75 |
| 11/02/16 | 500 | 8.9 |
| 11/03/16 | 500 | 8.91 |
| 12/12/16 | 1000 | 7.61 |

## Sales

**Configurable list (if none enter none)**

| Date Sold | Number of Shares Sold | Price per Share Sold |
| --- | --- | --- |
| 8/3/16 | 1000 | 14.64 |

## Documents & Message

**Signature**



**Full Name**

Ananda Patti


(redacted)

**Fitbit, Inc. (FIT) (2018)**                                                                    **Patti, Ananda**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|---|---|---|---|
| 8/2/2016 | Purchase | 500 | $13.4400 |
| 8/2/2016 | Purchase | 500 | $13.1900 |
| 10/7/2016 | Purchase | 1,000 | $14.0200 |
| 10/14/2016 | Purchase | 1,000 | $13.1499 |
| 10/27/2016 | Purchase | 1,000 | $13.7400 |
| 10/28/2016 | Purchase | 500 | $13.5100 |
| 10/31/2016 | Purchase | 500 | $13.2100 |
| 10/31/2016 | Purchase | 500 | $13.1000 |
| 11/2/2016 | Purchase | 500 | $12.7500 |
| 11/2/2016 | Purchase | 500 | $8.9000 |
| 11/3/2016 | Purchase | 500 | $8.9100 |
| 12/12/2016 | Purchase | 1,000 | $7.6100 |
| 8/3/2016 | Sale | 1,000 | $14.6400 |